Opinion issued October 7, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-07-00591-CR

NO. 01-07-00592-CR

———————————

Steven Avilez, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 262nd District Court

Harris County, Texas



Trial Court Case Nos. 1119152 & 1119154

 



 

O P I N I O N

          A
jury convicted appellant Steven Avilez of stalking (trial court case number
1119152; appellate court case number 01-07-00592-CR) and violation of a
protective order (trial court case number 1119154; appellate court case number
01-07-00591-CR).  See Tex. Penal Code Ann.
§§ 25.07, 42.072 (Vernon 2003
& Supp. 2010).  The jury sentenced
him to prison for three years on each count, with the sentences to run
concurrently.  

Avilez brings two issues on appeal. 
He contends that his convictions violate the Double Jeopardy clauses of
the Texas and United States Constitutions, but we overrule this issue because
the offenses of stalking and violating a protective order each contain unique
elements that are not required for conviction of the other offense.  Avilez also contends that he is entitled to a
new trial because the trial court was biased against him.  We decline to reverse on that ground because
his complaints relate to the trial court’s exercise of discretion in regulating
the conduct of the trial, and he does not allege fundamental trial error
implicating constitutional guarantees of due process.  Accordingly, we affirm.

FACTUAL BACKGROUND

Complainant Amanda Bucklin dated
and lived with appellant Steven Avilez for approximately 18 months.  She testified that he became physically and
emotionally abusive, and she ended the relationship.  Avilez was subsequently charged with and pleaded
guilty to stalking, and a trial court placed him on deferred adjudication.  The conditions of his community supervision
required that he have no contact with Amanda. 


Amanda testified that for a period
of time after her relationship with Avilez ended, she abused alcohol and drugs.  On occasion she called him and initiated
sexual activity.  Eventually she obtained
a protective order against Avilez.  Later
she married Zach Bucklin.  According to
Zach’s and Amanda’s testimony, Avilez began to initiate contact with them a
month after their daughter was born.  He
called them, called their friends and inquired about them, drove past their
home, and followed them.  They testified
that this behavior occurred repeatedly over the course of eight months.

In addition, Amanda testified that
she resumed abusing alcohol and spent approximately two months in a
rehabilitation facility with her infant daughter.  On one occasion, she saw Avilez outside the
building looking in.  Later, he mentioned
to her certain details that he could know only if he had been there, such as
the kind of baby carriage she used. 
Amanda denied initiating any contact with Avilez during this time,
except a single phone call that she placed at the request of a police
investigator who was trying to apprehend him. 
She obtained a second protective order, and ultimately Avilez was
charged with and convicted of violation of a protective order and stalking.

PROCEDURAL BACKGROUND

Avilez contends that his trial was
unfair because the judge was biased against him.  Accordingly, we describe in detail the
relevant trial proceedings and the trial judge’s conduct that has been
challenged on appeal.

Over the course of two days of
trial testimony, the court permitted the parties to develop the aforementioned
background information about the history of Avilez’s relationship with Amanda,
but the trial court repeatedly attempted to narrow the focus of the trial to the
specific time period and actions directly relevant to the then-pending charges
against Avilez.  The trial court
admonished many witnesses, including both Amanda and Avilez, to limit their
answers to “yes or no” if the question required no more.  The trial court also sustained numerous
objections that a witness was giving a nonresponsive answer.

The State called nine witnesses, two
of whom were the State’s primary witnesses, Amanda and Zach Bucklin.  Avilez’s trial counsel objected seven times
during Amanda’s initial direct examination, and the trial court sustained four
of those objections.  Near the end of
Amanda’s direct testimony, defense counsel objected for the first time that she
was testifying in the form of a narrative, and the trial court instructed the
prosecutor to limit the testimony to the form of questions and answers.  Then, before Amanda’s cross-examination, the
trial court addressed the attorneys outside the presence of the jury.  He advised them that he would allow Avilez’s
attorney to inquire generally into the continuing relationship that Amanda had
with Avilez to the extent it was relevant to rebut an element of a charged offense.[1]  However, the trial court also made clear his
intention to avoid unnecessary sordid detail.

TRIAL COURT:    But the bottom line is, you [the State] did
go into their background very extensively. 
I will let you [defense counsel] explore that to some degree.  There is some probative value, I guess, to
that; but not to the point where I’ll allow you to go into the details of this
or that or the other.  I wouldn’t let the
State—

 

.
. .

 

[S]o
if the situation’s where it looks like it’s going beyond what I’ve tried to
sort of outline, certainly, you’re welcome to make a record or make a bill,
whatever you want if you think I’m out of line. 
But I’m trying to keep it within those parameters.  I want just relevant testimony, and if it’s
relevant to the elements of the offense, then that’s one thing.  But we don’t need to go into, again, into the
sor[did] details of someone’s physical relationship, that’s the best way I can
put it.

 

.
. . 

 

DEFENSE COUNSEL:   I think we’re already there.  I mean, before we ever picked a jury I
figured it was going to be a free-for-all.

 

TRIAL
COURT:    Well, it is not going to be a
free-for-all.

 

DEFENSE
COUNSEL:   As far as relevance is
concerned.

 

TRIAL COURT:    Well, that was a very, very severe
miscalculation on your part because it is not going to be a free-for-all.  And this is basically looking at whether or
not during this period of time this Defendant engaged in the stalking of this
complainant and whether or not he violated a protective order during that
period of time.

 

Now,
as I have said, and I believe the State did as general a broad brush stroke as
they could to establish the relationship in the past.  But I am not going to let something come in
that then opens the door to something else and then we’re here trying a divorce
case.  I don’t do those.  I will not do those.  I am praying to God I never have to do one of
those.  That’s just where we’re going to
be.

 

If
you want to establish that she initiated contact with him and so forth, that’s
fine.  If you want to say they engaged in
a physical relationship, that’s fine. 
But that’s as far as I’m willing to go.

 

          During
cross-examination, Avilez’s attorney instructed Amanda to answer his question,
and the trial court told him, “Just object and I’ll give the instruction.”  When Amanda later gave a nonresponsive
answer, the trial court sua sponte instructed her, “If the question calls for a
yes or no answer, just answer yes or no. 
If you can’t answer yes or no, just say I can’t answer it that
way. . . .  But please,
just answer the questions that are asked and the lawyers will ask other
questions.  We all have to go by this
rule.”  The trial court sustained three
defense objections that Amanda’s answer was nonresponsive and admonished Amanda
at least four times that she should answer only “yes” or “no” if the question
called for a “yes” or “no” answer.

          During
Zach’s direct testimony, Avilez objected three times to hearsay and once to a
leading question.  Avilez did not object
that Zach was testifying in the form of a narrative.  During cross-examination, Avilez objected
that one answer was nonresponsive.  The
trial court sustained the objection and admonished Zach, “Just listen carefully
to the question.  If you can’t answer ‘yes’
or ‘no,’ if it’s a ‘yes’ or ‘no’ question, if you can’t answer it ‘yes’ or ‘no’
you may say that.  If you don’t
understand the question, you may say as well. 
Just try to focus on the questions the lawyers are asking and just
answer those.”

In his defense case, Avilez called
his sister and mother to testify, and then he testified in his own defense.  During his sister’s direct testimony, the trial
court again admonished defense counsel at the bench to narrow the questioning
to the relevant time period.  During the
direct testimony of Avilez’s mother, the trial court sua sponte admonished her
once that a question called for a “yes” or “no” answer.  During her cross-examination, the trial court
admonished her, “Ma’am, if it calls for a ‘yes’ or ‘no’ answer, please just
answer ‘yes’ or ‘no.’  It just takes up
so much more time.  I promise, these
lawyers are very capable of asking you all the questions that they want
answered.  So, if it calls for a ‘yes’ or
‘no,’ just answer, just answer ‘yes’ or ‘no.’ 
Thank you.”  Twice, the trial
court sua sponte advised her to answer only “yes” or “no” to questions calling
for “yes” or “no” answers.  On two other
occasions, the trial court asked her to speak up or speak into the microphone.

When Avilez himself took the stand,
the trial court repeatedly admonished him to confine his answer to the question
asked, including admonishments outside the presence of the jury.  At the beginning of Avilez’s testimony, his
attorney asked him where he grew up, and he responded, “I lived basically all
my life in Pasadena, but I have lived around different places.  I used to live—.”  The trial court interrupted him and instructed
him to answer the question.  His attorney
then asked him if he graduated from high school, and Avilez responded, “With
honors, sir.”  The trial court
immediately removed the jury to admonish Avilez.

TRIAL COURT:  On the record.  Mr. Avilez, you’ve been sitting in this
courtroom throughout this trial, and it’s obvious to me that you have to have
heard the admonishments that I’ve given the other witnesses.  I’ve sent the jury out because I don’t want
to admonish you in front of them, but I’m going to admonish you
nonetheless.  When these lawyers ask a
question, you answer only their question. 
If it calls for a yes or no answer, you answer them yes or no; do you
understand?

 

AVILEZ:     Yes, Your Honor.

 

TRIAL COURT:    Good. 
I don’t want to have to do this again. 
It’s a waste of time, but I will. 
You understand?

 

AVILEZ:     Yes, Your Honor.

 

The jury returned, and soon thereafter
Avilez’s attorney asked him about a job he held after college, “What were you
doing at NASA?”  Avilez responded, “I
worked in the labs.  We used to get—”, and the trial court admonished him, “Sir,
just answer the questions.”  Shortly
thereafter, Avilez’s attorney asked him, “What—did you actually work for the
National—NASA?  I can’t remember the
acronym.  National Aeronautic—whatever it
is.  Anyway, or did you work for a
subcontractor?” and he responded, “Actually, the name of the subcontractor is
United States Space Alliance.  It’s the
major subcontractor.”  The trial court
again removed the jury to admonish Avilez again.

TRIAL COURT:    On the record.  You’ve been on the stand for approximately 10
minutes, and this is the second time that I’ve sent the jury out to admonish
you.  Since you are a graduate with honors
apparently from high school, you probably understand this.  You answer the question that’s asked.  You understand?

 

AVILEZ:     Yes, sir.

 

TRIAL COURT:    You do it again, I’m going to hold you in
contempt.  You understand that?

 

AVILEZ:     Yes, sir, Your Honor.

 

TRIAL
COURT:    You know what that means?

 

AVILEZ:     I’ve heard the phrase, but not exactly.

 

TRIAL COURT:    It means six months in jail each time you do
it, and I can stack them up to 18 months. 
Do you understand that?

 

AVILEZ:     Yes, sir.

 

TRIAL
COURT:    Does that register with you?

 

AVILEZ:     Yes, Your Honor.

 

TRIAL COURT:    And if you want to talk to him for a minute,
[trial counsel], please do.  But we’re
not going to have a 12-minute answer to every simple question that you’re
asking.  You’re trying everything that
you can, I understand, to make these questions simple.  I’m making these admonishments very
simple.  Don’t do it again.

 

AVILEZ:     May I speak to my Counsel for a minute,
sir?

 

TRIAL
COURT:    No, sir, not unless he comes up
here.

 

TRIAL COUNSEL:         Could we have a couple seconds, Your
Honor?

 

TRIAL
COURT:    Yes.

 

.
. . 

 

TRIAL
COURT:    Let’s go.  Mr. Avilez, are we clear on this?

 

AVILEZ:     Yes, sir. 
With all due respect, I’m just trying to gather my thoughts.  I apologize.

          

TRIAL COURT:    I believe you’re trying to answer questions
that have not been asked.  That’s the
reason I sent the jury out with all due respect.  So, you have sat and watched this entire
trial, and you’re the only witness in this entire trial, besides your mother,
who has had a little trouble with that, but you seem to have a tremendous
amount of trouble with it.  So, you need
to understand, everybody goes by this rule. 
Everybody that testifies, whether it is someone who is a witness,
someone who is charged with a crime, I will give them the same level of
respect, the same level of decorum in dealing with them, that they will follow
the same rules.  Do you understand that?

          

AVILEZ:     Yes, Your Honor.

          

TRIAL COURT:    If you do it again, I’m going to hold you in
contempt.  So, don’t be surprised. Okay?

 

          The
jury returned, and direct examination continued.  Prior to holding Avilez in contempt, the
trial court stated three times “calls for a yes or no answer” when Avilez
offered additional information, sustained six objections that Avilez’s answer
was nonresponsive to his counsel’s question, and twice admonished Avilez’s trial
counsel at the bench.

TRIAL COURT: I’m not doing a
divorce . . . .  We’re getting way too
broad on this.  The only question to be
answered in this trial is whether or not he violated a protective order and/or
stalked this woman.  And the definition
of the term, between the dates of April 4th, 2006, through November 16th,
2006, and that’s it.

 

.
. . 

 

I’m about to hold him in
contempt.  I don’t know how I can be any
clearer to him.  I know you’ve been clear
to him.  He’s volunteering an answer
every time you ask him something.  I’m
glad you’re leading because you’re trying as hard as you can to keep things in
the middle of the road, but he is absolutely resistant to that.  I told him if he does it again, I’m going to
hold him in contempt.  If he does it again,
I’m going to. . . .  I’m telling you this
so you won’t be surprised.  You’re
probably surprised I haven’t already done it. . . . That’s it.  He can hear me.  I guarantee you he’s listening.

 

The trial court held
Avilez in contempt after the following testimony.  Avilez had testified that Amanda had
continued to initiate contact during the relevant time period and that she had
invited him to meet her at a convenience store to retrieve some personal items.

          Q.      Did you have reason to believe that these items
were ever at that location?

          

A.      Oh, yes,
sir.

 

          Q.      And when you got over there, what did you
find?

          

A.      I
was—nothing.  I was walking down the
street and then just out of nowhere somebody comes behind me and says, hey, you
f—ing p—y.  And I turned around and it’s
Zach and another gentleman.

 

The trial court
immediately instructed the bailiff, “Take the jury out.”  Then the trial court noted that this was the
third time he had removed the jury, and he held Avilez in contempt.

The second instance of contempt occurred after the
following question.

 

Q.      During
this time period between April 4th, 2006, and November 16, 2006, did —do you
think she was scared of you?

 

A.      She told
me she wasn’t.

 

The trial court again
removed the jury and sentenced Avilez to another six months, saying, 

These are very simple rules, Mr. Avilez; and it is
obvious to me that you are intentionally violating them and you are causing a
great deal of delay in this trial. 
You’re causing these lawyers to have to do twice as much work as they
should have to get the same amount of information in front of the jury.  So, I’m a man of my word.  That will be six more months.  And if you volunteer information again when
it calls for a yes or no answer, I’ll do the same thing again.  It’s very simple and I have no doubt that you
understand it.  But you’re defying this
Court, and I don’t understand why.  I
have no other course to take but to hold you in contempt and give you another
six months.

 

The jury convicted Avilez of both stalking
(trial court case number 1119152; appellate case number 01-07-00591-CR) and
violation of a protective order (trial court case number 1119154; appellate
case number 01-07-00592-CR).  It
sentenced Avilez to confinement for three years in prison on each count, to run
concurrently.  On appeal, Avilez contends
that (1) his convictions amount to double jeopardy because he was punished
twice for the same conduct and (2) he was deprived of due process because the
trial court was biased against him.

DOUBLE JEOPARDY

In his first issue, Avilez argues
that his convictions violate the Double Jeopardy clauses of the Texas and
United States Constitutions because, as alleged in the indictments, stalking is
a lesser-included offense of violation of a protective order.[2]  The Fifth Amendment to the United States Constitution states:
“No person . . . shall . . . be subject for the
same offense to be twice put in jeopardy of life or limb.”[3]  The
Double Jeopardy Clause protects an accused from being punished more than once for
the same offense.[4]  When multiple punishments stem from a single
prosecution, the offenses may be the same if one is a lesser-included offense
of the other or if the two offenses are defined under distinct statutory
provisions but the legislature has made it clear that only one punishment is
intended.[5]  Whether two offenses are the
same is a matter of legislative intent.[6]

          Such
legislative intent is ordinarily determined by applying the “same-elements”
test of Blockburger v. United States.[7]  “To determine whether jeopardy attaches, a
court must inquire whether each offense contains an element not contained in
the other.”[8]  If not, they are the same offense and double
jeopardy bars multiple punishments.[9]  “In a multiple punishments case, an appellate
court should focus on the statutory elements of the offenses . . . since the
paramount consideration in multiple punishment claims is whether the
legislature intended to permit such punishments.”[10]

          In
this case, Avilez was convicted of violation of a protective order and
stalking.  A conviction for violation of
a protective order requires proof of a protective order issued under Chapter 85
of the Family Code and proof that the defendant (1) one time, (2) intentionally
or knowingly violated that order, (3) by committing family violence or another
specified action, by communicating with or threatening a protected person, or
by going to or near the home or workplace of a protected person.  Tex.
Penal Code Ann. § 25.07.  A
conviction for stalking requires proof that the defendant (1) on more than
one occasion and pursuant to the same scheme or course of conduct directed at
another person, (2) knowingly, (3) engaged in behavior that
(a) he knows or reasonably believes the other person will regard as
threatening, (b) caused the other person or a member of the other person’s
family or household to fear bodily injury, death, or that an offense will be
committed against that person’s property, and (c) would cause a reasonable
person to fear bodily injury, death or that an offense will be committed
against the person’s property.  Id. § 42.072.

Comparing the statutory elements,
each offense includes an element not included in the other.  Violation of a protective order requires proof
of a protective order, but stalking does not. 
Stalking requires proof that the defendant engaged in certain prohibited
behaviors on more than one occasion, but violation of a protective order may be
proven with only one instance of misbehavior. 
Because each offense includes an element not included in the other, we
hold that violation of a protective order and stalking are not the same offense
and double jeopardy does not preclude multiple punishments.[11]  We overrule Avilez’s first issue.

JUDICIAL BIAS

          In
his second issue, Avilez contends that he is entitled to a new trial because
the trial court was biased against him. 
Specifically, he challenges the trial court’s repeated instructions to
him to answer only the question asked, the relative latitude that the trial
court afforded the State’s witnesses compared with his own testimony, and the actions
of the trial court in twice holding him in contempt for nonresponsive narrative
answers.[12]  Avilez argues that the jury was “undoubtedly
affected by the trial court’s ceaseless and unnecessary admonishments” and that
he himself “was undoubtedly prevented from being able to testify, except in an
abbreviated manner, for fear he would be held [in] contempt.”

I.              
Preservation
of Error

The State asserts that Avilez’s issue
is not preserved for our review.  Avilez
did not object to the alleged bias at any time during the guilt-innocence phase
of trial, nor did he move for the judge’s recusal.  Ordinarily, to preserve an error for
appellate review, the complaining party must make a “timely request, objection,
or motion.”[13]

But some legal rights cannot be
forfeited.[14]  “Some rights are widely considered so
fundamental to the proper functioning of our adjudicatory process as to enjoy
special protection in the system.”[15]  Thus violations of rights that are “waivable
only” and denials of “absolute, systemic requirements” are considered
“fundamental error” and may be raised for the first time on appeal.[16]  These rights include, for example, the right
to assistance of counsel (waivable) and jurisdiction over the person or subject
matter of the case (systemic).[17]  This Court has previously reviewed for
fundamental error an unpreserved complaint that the trial court was not
impartial.[18]

Avilez argues that the trial
court’s comments, conduct of the trial, and contempt rulings show that the
trial court was biased.  Assuming without
deciding that Avilez’s complaint, if valid, implicates the type of systemic
error that we may address for the first time on appeal, we consider whether the
trial court’s actions violated Avilez’s due process right to an impartial judge.[19]

II.           
Due
Process Right to a Neutral Judge

Avilez complains that he was denied
a fair trial because the judge was biased. 
In support of this proposition, he notes that the trial court admonished
him no fewer than 18 times before the jury, twice sua sponte instructed the
jury to disregard his testimony, and twice held him in contempt of court due to
his nonresponsive answers.  Avilez
contends that the trial court was far more lenient toward the State’s
witnesses.  He claims to have been harmed
because the jury was influenced by the trial court’s actions and because he was
effectively precluded from presenting a complete defense for fear of being held
in contempt.

Avilez relies upon two authorities
for his argument that he was denied a fair trial.  The first, Brumit v. State, Avilez offers for the proposition that “due
process requires a neutral and detached hearing body or officer.”[20]  The other, Dockstader v. State, is offered for the proposition that reversal
may be predicated on a finding that a judicial impropriety was committed and
that prejudice probably resulted.[21]  We construe Avilez’s argument on appeal to be
as follows: that the trial court was lenient and permissive with respect to
testimony offered by the State, specifically from the complainant; that in
contrast, the trial court intimidated Avilez and gave him essentially no
latitude to present testimony while he was on the stand; that these actions by
the trial court demonstrated bias and therefore deprived Avilez of a fair trial
in derogation of his due process rights; and that Avilez was specifically
harmed because of a presumed impact on the jury from the trial judge’s conduct
and because Avilez presumably was unable to offer complete testimony.  As we explain below, the appellate record
before us is inadequate to support a conclusion that Avilez’s trial was
fundamentally unfair so as to require reversal.

We begin with first
principles.  The Fourteeth Amendment
provides that the State may not “deprive any person of life, liberty, or
property, without due process of law.”[22]  A neutral and detached judge is one of the
minimum requirements of due process in criminal proceedings.[23]  “‘A fair trial in a fair tribunal is a basic
requirement of due process.’”[24]  Due process requires that a criminal trial be
held “before a judge with no actual bias against the defendant or interest in
the outcome of his particular case.”[25]  And due process will not permit a judge to assume
the role of a prosecutor.[26]  It is important to note, however, that not
every complaint about a judge or the conduct of a trial implicates
constitutional due process protections. 
Indeed, “‘most matters relating to judicial disqualification [do] not rise
to a constitutional level,’”[27] and “‘matters of kinship,
personal bias, state policy, remoteness of interest, would seem generally to be
matters merely of legislative discretion.’”[28]

Avilez does not argue that the
trial court was biased in the sense of having a pecuniary or other direct
personal interest in the outcome of his case. 
Nor does he argue that, in regulating the testimony and conduct of the
trial, the trial court functioned as a prosecutor, prejudged his case, became
embroiled with him or his counsel, or showed a personal favoritism toward the
prosecution.  Thus, his complaints do not
raise the kind of fundamental procedural unfairness that the Supreme Court has
held to be an unconstitutional violation of due process rights.[29]

Rather, Avilez argues that his
trial was unfair because the trial court allowed the State’s witnesses great
leeway in testifying but actively managed and limited his own testimony.  This complaint implicates matters peculiarly
within the trial court’s discretion, i.e., the regulation of testimony,
processing of evidence, and general conduct of the trial.[30]  We have reviewed the entire record.  Throughout the entire trial, the trial court
exercised the kind of control contemplated by Rule of Evidence 611.  The court admonished both prosecution and
defense witnesses to limit their answers to questions calling for a “yes” or “no”
response, and the court repeatedly advised the lawyers at bench conferences and
outside the presence of the jury not to elicit testimony that would be irrelevant
to the offenses charged or the time period involved.  The trial court reminded the attorneys about
his desire to avoid unnecessary prurient details and that he wanted them to
present only evidence that was relevant to an element of the charged offense.  The trial court exercised its discretion
during both the State’s case-in-chief, for example admonishing Amanda and Zach,
and during the defense case, admonishing Avilez and his mother.

As we have
already observed, Avilez did not preserve a challenge to the trial court’s
exercise of its discretion in these rulings, and he does not challenge any
particular ruling on appeal as an abuse of the trial court’s discretion.  Thus, whether the trial court abused its discretion
is not properly before us in this appeal. 
See Tex. R. App. P. 33.1. 
Moreover, Avilez directs us to no trial objections, requests for jury
instructions, contemporaneous offers of proof regarding testimony the trial
court “undoubtedly” prevented him from offering, or motion for new trial or
hearing thereon.  Had such objections and
offers been made at trial, it is conceivable that the trial court may have
reconsidered some of its rulings, allowed Avilez greater latitude in his
testimony, or permitted specific testimony essential to Avilez’s defense.  Or we might have been able to correct a trial
error on appeal.  But without such a
record, we are unable to discern any fundamental unfairness that could rise to
the level of a due process violation.[31] 

Finally, we note that most matters
related to judicial conduct within the broad confines of the discretion
traditionally afforded to a trial court do not implicate constitutional due
process protections.[32]  For example, the Texas Code of Judicial
Conduct provides that “[a] judge shall be patient, dignified and courteous to
litigants, jurors, witnesses, lawyers, and others with whom the judge deals in
an official capacity . . . .”[33]  We do nothing to diminish this highly
appropriate expectation of the judiciary by further observing that a judge’s alleged
failure to meet the standard does not necessarily, and in the absence of
contemporaneous objections usually will not, constitute grounds for reversible
error.[34]  Indeed, “judicial rulings alone almost never
constitute a valid basis for a bias or partiality motion,” and a trial court’s
opinion would not constitute bias unless it derives from “an extrajudicial
source . . . [or] reveal[s] such a high degree of favoritism or antagonism as
to make fair judgment impossible.”[35]

          We
conclude that the record does not clearly demonstrate bias or a violation of
Avilez’s due process rights, and we hold that Avilez has not overcome the
presumption that trial court acted correctly.[36]  We therefore overrule Avilez’s second issue.

CONCLUSION

          We
affirm the judgments of the trial court.

 

 

                                                                      Michael
Massengale

                                                                      Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Justice
Sharp, concurring, in an opinion to follow.

Publish.  Tex.
R. App. P. 47.2(b).

 











[1]             Among other elements of the
offense, to be convicted of stalking, a defendant must be shown to have
knowingly engaged in specified behavior that he knew or reasonably believed the
other person would regard as threatening. 
Tex. Penal Code Ann. §
42.072(a)(1).  We infer that the issue
being discussed by the court and counsel was the extent to which Avilez would
be permitted to present evidence about the nature of his continuing contacts or
relationship with Amanda so as to rebut the allegation that he knew or
reasonably believed that Amanda would regard his conduct as threatening. 





[2]             Avilez acknowledges that he is raising this issue for
the first time on appeal.  A defendant
may raise double jeopardy for the first time on appeal “when the undisputed
facts show the double jeopardy violation is clearly apparent on the face of the
record and when enforcement of usual rules of procedural default serves no
legitimate state interests.”  Gonzalez v. State, 8 S.W.3d 640, 643
(Tex. Crim. App. 1990).  Thus, we will
determine if the appellate record clearly shows a double jeopardy
violation.  See id. at 643–45.

 





[3]             U.S. Const. amend. V.  The Double Jeopardy Clause applies to the
states through the Fourteenth Amendment. 
Littrell v. State, 271 S.W.3d
273, 275 (Tex. Crim. App. 2008) (citing Brown
v. Ohio, 432 U.S. 161, 164, 97 S. Ct. 2221, 2225 (1977)).  The Texas Constitution contains
similar protections: “No person, for the same offense, shall be twice put in
jeopardy of life or liberty, nor shall a person be again put upon trial for the
same offense, after a verdict of not guilty in a court of competent
jurisdiction.”  Tex. Const.
art. 1, § 14.  Conceptually, the
state and federal double jeopardy provisions are identical.  Phillips
v. State, 787 S.W.2d 391, 393 n.2 (Tex. Crim. App. 1990).  Avilez has not provided argument or authority
concerning the protection provided by the Texas Constitution or how that
protection differs from the protection provided by the United States
Constitution.  State and federal
constitutional claims should be argued in separate grounds, with separate
substantive analysis or argument provided for each ground.  Muniz
v. State, 851 S.W.2d 238, 251–52 (Tex. Crim. App. 1993); Heitman v. State, 815 S.W.2d 681, 690 n.
23 (Tex. Crim. App. 1991).  We therefore confine
our analysis to Avilez’s federal constitutional arguments.

 





[4]             Littrell, 271 S.W.3d at 275.  

 





[5]             Id.
at 276.  

 





[6]             Id.
at 276 (citing Missouri v. Hunter,
459 U.S. 359, 368, 103 S. Ct. 673, 679 (1983)).

 





[7]             284 U.S. 299, 304, 52 S. Ct.
180, 182 (1932); see Littrell, 271 S.W.3d at 276.

 





[8]             Milner,
263 S.W.3d 353, 356 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing Blockburger, 284 U.S. at 304, 52 S. Ct.
at 182).  

 





[9]             See United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993).

 





[10]           Ex parte Pool, 71 S.W.3d 462, 466–67 (Tex. App.—Tyler 2002, no pet.) (citing State v. Perez, 947 S.W.2d 268, 272
(Tex. Crim. App. 1997) (“[I]t is logical to compare statutory elements in the
multiple punishments context where Blockburger
is a rule of statutory construction to be used in determining legislative
intent.”)).

 





[11]           See Rogers v. State, 305 S.W.3d 164, 169–70
(Tex. App.—Houston [1st Dist.] 2009, no pet.).





[12]           The appellate record does
not reflect that a final judgment was entered relating to findings of contempt against
Avilez, and those findings are not challenged on appeal.

 





[13]           Tex.
R. App. P. 33.1(a)(1);
Brewer v. State, 572 S.W.2d 719, 721
(Tex. Crim. App. 1978) (holding that when no objection is made, remarks and
conduct of court may not be challenged on appeal unless they are fundamentally
erroneous).

 





[14]
          See Saldano v.
State, 70
S.W.3d 873, 887–88 (Tex. Crim. App. 2002); Marin
v. State, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), overruled on other grounds, Cain
v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).  

 





[15]           Blue v. State, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (plurality op.).

 





[16]       Saldano, 70 S.W.3d at 888 (citing Marin,
851 S.W.2d at 280); see McLean v. State, 312 S.W.3d 912, 915–16
(Tex. App.—Houston [1st Dist.] 2010, no pet.) (explaining fundamental error).  “A ‘systemic requirement’ (also known
as an ‘absolute requirement or prohibition’) is a law that a trial court has a
duty to follow even if the parties wish otherwise.  Any party that is entitled to appeal may
complain on appeal that such a requirement was violated, even if the party
failed to complain about the failure or waived the application of the law.”  Mendez
v. State, 138 S.W.3d 334, 340 (Tex. Crim. App. 2004) (citing Marin, 851 S.W.2d at 280 (explaining
differences between systemic error, which pertains to preservation, and
structural error, which pertains to harm analysis)).

 





[17]           Saldano, 70 S.W.3d at 888.

 





[18]           Jaenicke v. State, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d); see also Richardson v. Quarterman, 537
F.3d 466, 473 (5th Cir. 2008) (“Structural errors occur only in a very small
class of cases, such as when a trial judge is actually biased.”); Arnold v. State, No. 05-07-00120-CR,
2008 WL 3307079, at *5 (Tex. App.—Dallas July 31, 2008, no pet.) (not
designated for publication) (holding that trial court objection not required to
preserve issue for appeal and noting that lack of impartial trial judge is
structural error not subject to harmless error analysis).

 





[19]           See Brumit v. State, 206 S.W.3d 639, 644–45 (Tex. Crim. App. 2006) (“We need not decide
today whether an objection below is required to preserve an error of this
nature on appeal because the record here does not reflect  partiality of the trial court or that a
predetermined sentence was imposed.”); accord
McLean, 312 S.W.3d at 917.





[20]           Brumit, 206 S.W.3d
at 645.

 





[21]
          233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.]
2007, pet. ref’d) (citing Markowitz v.
Markowitz, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied)); see also Metzger v. Sebek,
892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied).





[22]
          U.S. Const. amend. XIV; see also Tex. Const. art. I, § 19 (“No citizen of this State shall be
deprived of life, liberty, property, privileges or immunities, or in any manner
disfranchised, except by the due course of the law of the land.”).

 





[23]           See, e.g., Ward v. Vill. of Monroeville,
Ohio, 409 U.S. 57, 59–62, 93 S. Ct. 80, 82–84 (1972); Morrissey v. Brewer, 408 U.S. 471, 489, 92 S. Ct. 2593, 2604 (1972);
Brumit, 206 S.W.3d at 645 (citing Gagnon v. Scarpelli, 411 U.S. 778, 786,
93 S. Ct. 1756 (1973)); Jaenicke, 109 S.W.3d at 796; Vogt v. Bexar County, 23 S.W. 1044, 1046
(Tex. Civ. App. 1893, writ ref’d) (“due process of law requires that a person
shall have . . . a reasonable opportunity to be heard before an impartial
tribunal”).

 





[24]           Caperton v. A.T. Massey Coal Co., Inc., 129 S. Ct. 2252, 2259 (2009) (quoting In re Murchison, 349 U.S. 133, 136, 75
S. Ct. 623, 625 (1955)).

 





[25]           Bracy v. Gramley, 520 U.S. 899, 905, 117 S. Ct. 1793, 1797 (1997) (citing Aetna Life Ins. Co. v. Lavoie, 475 U.S.
813, 821–22, 106 S. Ct. 1580, 1585–86 (1986), and Tumey v. Ohio, 273 U.S. 510, 523, 47 S. Ct. 437, 441 (1927)).  For example, a criminal defendant’s due
process rights are violated when the trial judge has a pecuniary interest in
his case.  E.g., Lavoie, 475 U.S. at
816–18, 822, 106 S. Ct. at 1582–83, 1585 (holding that appellant’s due process
rights were violated when state supreme court justice cast deciding vote in
case, which had effect of increasing settlement value of justice’s own pending
lawsuit); Tumey, 273 U.S. at 532, 47
S. Ct. at 444 (holding that appellant’s due process rights were violated when
mayor received compensation for his statutorily-mandated judicial duties only
if defendant was convicted).

 





[26]
          In re
Murchison,
349 U.S. at 137, 75 S. Ct. at 626 (“Fair trials are too important a part of our
free society to let prosecuting judges be trial judges of the charges they
prefer.”).  A trial court’s impartiality
can be compromised when the trial judge acts as both prosecutor and judge, as
in certain criminal contempt cases, or when the judge exhibits hostility toward
the defendant or his lawyer.  E.g.,
id. at 138–39, 75 S. Ct. 626–27 (disapproving of “spectacle” of trial judge
presenting testimony that he must consider in adjudicating guilt or innocence);
Mayberry v. Pennsylvania, 400 U.S.
455, 465, 91 S. Ct. 499, 505 (1971) (“Whether the trial be federal or state,
the concern of due process is with the fair administration of justice.  At times a judge has not been the image of
the ‘the impersonal authority of law’ but has become so ‘personally embroiled’
with a lawyer in the trial as to make the judge unfit to sit in judgment on the
contempt charge.”); see also Earley v. State, 855 S.W.2d 260, 262–63
(Tex. App.—Corpus Christi 1993, pet. dism’d) (holding that trial court violated
defendant’s due process rights by prejudging the defendant in probation-revocation
case because trial court said, “I am just upset that you did a third-degree
felony.  I would rather have seen you
with a first-degree, because I would like to give you life.”).

 





[27]           Caperton, 129 S. Ct. at 2259 (quoting FTC
v. Cement Institute, 333 U.S. 683, 702, 68 S. Ct. 793, 804 (1948)).

 





[28]           Id.
(quoting Tumey, 273 U.S. at 523, 47
S. Ct. 437).

 





[29]           See Lavoie, 475 U.S. at 816–18, 822, 106 S. Ct. at 1582–83, 1585 (pecuniary
interest); Tumey, 273 U.S. at 532, 47
S. Ct at 444 (same); In re Murchison,
349 U.S. at 137, 75 S. Ct. at 626 (acting as prosecutor); Mayberry, 400 U.S. at 465, 91 S. Ct. at 504–05 (personal
embroilment with defendant or counsel); Earley,
855 S.W.2d at 262–63 (prejudging case); Abdygapparova
v. State, 243 S.W.3d 191, 206–09 (Tex. App.—San Antonio 2007, pet. ref’d)
(favoring prosecution).

 





[30]           See Tex. R. Evid. 611 (“The court shall exercise reasonable control
over the mode and order of interrogating witnesses and presenting evidence so
as to (1) make the interrogation and presentation effective for the
ascertainment of the truth, (2) avoid needless consumption of time, and (3)
protect witnesses from harassment or undue embarrassment.”); see also State ex rel. Rosenthal v. Poe,
98 S.W.3d 194, 199 (Tex. Crim. App. 2003) (“[A] trial court’s inherent power
includes broad discretion over the conduct of its proceedings.”).

 





[31]           See, e.g., Potier v. State, 68 S.W.3d
657, 665 (Tex. Crim. App. 2002) (holding that “the exclusion of a defendant’s
evidence will be constitutional error only if the evidence forms such a vital
portion of the case that exclusion effectively precludes the defendant from
presenting a defense”).

 





[32]           E.g.,
Bracy, 520 U.S. at 904, 117 S. Ct. at
1797 (holding that most questions concerning judge’s qualifications to hear case
are “answered by common law, statute, or the professional standards of the bench
and bar”).  

 





[33]
          Tex. Code Jud. Conduct, Canon 3, reprinted in Tex. Gov’t Code Ann., tit. 2, subtit. G
app. B. (Vernon 2005).

 





[34]       See, e.g., Kemp v. State, 846 S.W.2d 289, 305 (Tex. Crim. App. 1992)
(quoting Shapley v. Tex. Dep’t of Human
Res., 581 S.W.2d 250, 253 (Tex. App.—El Paso 1979, no writ)).

 





[35]           Liteky v. United States, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157
(1994).  

 





[36]           See Brumit, 206 S.W.3d at 645 (citing Thompson
v. State, 641 S.W.2d 920, 921 (Tex. Crim. App. 1982)).